Rachel Lewis, Administratrix, *v.* New York Life Insurance Company.

## SUPREME COURT—IN BANCO.

### JANUARY TERM—1881.

*Judd and McCully, J. J., (Harris, C. J., dissenting).*

RACHEL LEWIS, ADMINISTRATRIX, *vs.* NEW YORK LIFE IN-
SURANCE COMPANY.

#### ON EXCEPTIONS.

THE INTESTATE SAMUEL L. LEWIS was insured by the defendant
and in his contract made a warranty when the policy was issued
that, (1st), he "had not been afflicted since childhood with any
serious disease," and (2d), that he was "then in good health."
At that time he was afflicted with an aneurism, the rupture of
which within twelve days thereafter caused his death ;

The physicians sworn term aneurism a serious disease ;

HELD, that the warranty in that respect was broken.

The warranty that he was then in good health was also broken.

Judgment ordered for defendants.

Opinion of a majority of the Court by McCULLY, J.

This is an action by the plaintiff, administratrix of her late
husband, Samuel L. Lewis, of Honolulu, to recover $5,000
life insurance.   Trial was had in the April Term, 1880, with
verdict for the plaintiff.   The defendant took exceptions to
rulings and directions of the Court, which being sustained in
part by a majority of the Court, a second trial was had, and
to rulings and directions given at that time the exceptions
now under consideration were taken.

The following synopsis of the bill will show the points to
be passed on:

The defendant excepted to the admission of evidence of
conversation of defendant's agent with Dr. McGrew, Testa,
and Mr. and Mrs. Magnin, either before or after the risk was

Rachel Lewis, Administratrix, *v.* New York Life Insurance Company.

·taken; and the refusal of the Court to strike out said evidence; to the refusal of the Court ¢to order non-suit on the ground of breaches of warranty in respect to the applicant's answers about his health, and attending physicians, and for fraudulent misrepresentations and concealments; and to the refusal, after evidence was closed, to direct a verdict for the defendant.

To the instruction of the Court that the jury might consider from the evidence admitted whether the applicant was "disarmed" by Berger's representations from naming any other physician than Dr. Cummings; that the defendant company is bound by the acts of its special agent, and by his knowledge, and is bound by full representations of Lewis (if made) to Berger; that the defendant would be estopped if any representations of Berger to Lewis induced him to fail to make full and true answers, from taking advantage of such failure, and if the agent took charge of the preparation of the answers and suggested them.

The bill excepts to the above in several forms, and likewise to other rulings which it will not be necessary to pass upon.

The testimony of Dr. McGrew appears by the record to have been admitted if it should bring to Berger a knowledge of the condition of Lewis' health, and the jury was instructed to take account of it only as the evidence might be that it was had before the insurance transaction was completed.

Mr. Magnin testifies to his precautionary remarks and inquiries, all of which were set aside by Berger as being a matter of form, and that "Lewis is well now," and the examining physician had passed him, and Mrs. Magnin's testimony is merely to the same conversation, so far as she heard it.

Testa's evidence is as to the conversation he overheard between Lewis and Berger, and the admissibility of this was distinctly passed on by the Court in its former decision.

The testimony of information given to Berger respecting the previous illness of the applicant was clearly important and relevant. The one, Magnin, was a relative to whom the

applicant referred the agent for information, and the other was a physician, who had observed Lewis while attending members of his family, and who at that time was one of the examining physicians of the company, and his information, which was of a general nature to the effect that Lewis was a weakly or delicate man, was given upon the agent's saying that he was proposing to insure him. We hold that the agent would be chargeable with knowledge of any facts derived from these sources. It was left for the jury to consider, inasmuch as Berger's recollection of these conversations differed from the other parties as to the effect of them and the time when had, what they would find to be true.

But the most important branch of the exceptions is that which is made in several forms to the refusal of the Court upon certain evidence claimed to be indisputable, and not contradicted, to order a non-suit, or direct a verdict for the defendant on the ground of breach of warranty, and on which the defendant now asks for judgment, notwithstanding the verdict.

We make some extracts from the evidence given:

Mrs. Lewis says: "My husband died November 29, 1879, at twenty minutes past 12 M. He appeared to be in good health. He did not complain. He ate hearty, and was at his business up to the time of his death. From the time of insurance to his death he ate well, slept well, and was at his business every day. He attended a 'surprise party' November 19th. He appeared well and enjoyed himself, danced and waited on company; retired that night at 2 A. M., and got up as usual, not complaining of suffering and ill effects. November 29th he died; appeared well and did not complain."

Dr. Cummings: "Attended him at his last illness (not meaning at his death) from August 4th to September 20th. I thought he was well when I left him. He was to all appearance well."

Question.—"Did you tell him he had any severe illness?"

Answer.—"I repeatedly examined him and said to him I could not detect any local disease.   Have attended him for years.   Examined his urine for trouble with the kidneys—for what I could find.   He said he had pain in the kidneys, and complained of pain in his back.   I stripped him several times and examined him by sounds and feeling.   I suspected aneurism, but was unable to find it."

Ques.—"Was he a well man?"   Ans.—"I thought him cured."

Ques.—"If you suspected aneurism, would you say he was a well man?"   Ans.—"I could not find it, and so called him cured."

Ques.—"Why did you not communicate your suspicion of aneurism to his family?"   Ans.—"It is sure death in the end, and useless to alarm a family.   Cannot say how long under favorable circumstances he could live.   I attended the post mortem examination.   The two lower vertebræ, by the pressure on them of the aneurism, were dead.   There was *caries* and pieces broken away.   I think to occasion such an appearance would take some years.   Cannot say he would be likely to know he was sick.   The aneurism had burst."

Dr. McKibbin, who examined Lewis for the defendant company, says:   "I made the post mortem examination. Found a small aneurism; small as a pullet's egg.   There was *caries* of two vertebræ.   He must have had the aneurism more than a year.   His heart was perfectly healthy.   Aneurism does not necessarily affect the heart; at least one of that size would not."

Dr. McGrew.   "Something serious was the matter with Lewis twelve days before he died, if he died of aneurism.   If *caries* of the spine resulted from pressure, it would have caused pain, but it would not have shown what disease it was.   Sometimes a man may live ten or fifteen years with an aneurism. *Caries* is a slow effect.   I would consider a man with such an aneurism a very sick man.

Rachel Lewis, Administratrix, *v.* New York Life Insurance Company.

Question—"Would the man know he was a sick man?" Answer—"He might not know he had an aneurism. If he had an aneurism he would not necessarily know he was a sick man. It is not necessarily accompanied with pain; frequently it causes great pain; not ordinarily disturbs the functions of the body. The definition given in Webster's Dictionary is 'a soft pulsating tumor arising from the preternatural dilation or rupture of the coats of an artery.'"

Question 2 of the application is: "Has the party had or been afflicted since childhood with any of the following complaints?" (enumerating twenty-four items, to which separate answers are required), the last item being: "Or any serious disease;" to all of which queries, as also to the last, Lewis answers "no."

Is aneurism a "serious disease?" The physicians term it such, in their testimony cited. It might not be called a constitutional or general disease, such as rheumatism, scrofula or cancer, enumerated in this list. We would class it with the items of "rupture," and "fistula," as a local defect. Now, the object of the insurance company in putting these inquiries to the applicant is to ascertain if he is free at the date of the insurance from all diseases and tendencies to diseases, and from all physical defects which will cut off life before the time he ought to live by tables of the duration of life. Is there any doubt that in this view aneurism is a serious disease?

The revelations of the post mortem examination now demonstrate that on the 17th of November, Lewis was the subject of the aneurism which was then within twelve days of the crisis of rupture, to kill him as surely and almost as quickly as a decapitation. But by his answers he warrants to the company that he has no serious disease, or as we may read it specifically, that he has no aneurism. This is a warranty, unqualified, that he has none in fact. All of the authorities are that a pure warranty is not released by the ignorance of fact of the party making it. This was not a warranty that he had no serious

Rachel Lewis, Administratrix, *v.* New York Life Insurance Company.

disease (no aneurism) to his knowledge. The form of appli-
cation of the defendant company offers to contract for life in-
surance when the party will warrant that he has no serious
disease. Now, if Lewis had made this insurance one, two, or
three years earlier, there would have been room to doubt if
his aneurism then existed, and this case would have taken
another course; but we have said that the facts of this case
are a demonstration. There was a breach of warranty, and
the defendant was entitled to judgment, unless it is made to
appear " that the representation was not the statement of the
plaintiff, and that the defendant (his agent) knew it was not
when he made the contract; and that it was made by the
defendant, who procured the other's signature thereto." We
quote the language of our previous decision.

We have applied this principle wherever the testimony sus-
tains it. The answer, that he had no attending physician, was
ruled to be Berger's and not Lewis's, for Lewis had mentioned
the name of Dr. Cummings. The answer, no dyspepsia, is
proved to have been written at Berger's interpretation that
his dyspeptic symptoms being transient and not serious, need
not be mentioned. And the answer " no " to question 13,
" has the party ever been seriously ill? " was likewise allowed
to be considered by the jury if it had not been made by Ber-
ger, upon his remark to Magnin that it did not matter as he
was well now. These were liberal rulings in favor of the
plaintiff. There is no testimony as to the filling up of the
answer to the query now under consideration. But as Berger
had no knowledge of *this* existing serious disease, or of any,
we cannot infer that he waived the truth in this case, and
wrote an answer contrary to Lewis's statement, Lewis him-
self knowing nothing of the fact, and therefore not being able
to state that he had a serious disease. The plaintiff's own tes-
timony is to her husband feeling very well those days. Mr.
Berger testifies that when he met him and introduced the sub-
ject of life insurance, Lewis put both hands on his chest and

said: "I am a healthy subject." It is clear that Lewis believed himself well, and was ready to warrant it. We ought, in examining the testimony in this important part of the case, which determines whether the assured is liable for the warranty as it appears on the face of the papers, to take account of the desire of the subject of insurance to rank as a well man. It is only after proofs which cannot be contradicted that men in middle life admit to themselves the existence of disease, which is to cut them off. But Lewis did not appear to have been advised by any physician that he had a disease. On the contrary, in the pride of health, he puts his hands on his chest and says he is a healthy subject—and he proceeds to warrant it to the company by answering "no" to the question if he has any serious disease.

By the terms of this application this is made an absolute warranty. It is not qualified by the applicant's good faith, knowledge or ignorance. Upon the warranty that he has no serious disease at the date of the insurance, the company makes its contract conditional that a breach of the warranty makes the contract void.

Upon the testimony offered there was no room to question that there was a breach of warranty, and the jury should have been instructed to bring a verdict for the defendant.

We have so far confined the discussion of the breach of warranty to the negation of any serious disease. But question 14 is: "Is the said party now in good health?" to which, in the application, Lewis answers yes, corresponding to his *assertion* that he was "a healthy subject." He, therefore, warrants the other contracting party that he is in fact in good health. Is this warranty qualified? Is it not by the applicant's answer, as it might have been by the answer "yes, so far as I know," or "yes, in my belief or opinion." Such an answer would then have raised the question of the applicant's good faith, or the company might decline to take the risk without the absolute guarantee. But if it is said that the warranty was made

Rachel Lewis, Administratrix, *v.* New York Life Insurance Company.

in good faith, although what was warranted was not a fact, then it may be asked on what principle it shall be said that the company shall be the loser, rather than the beneficiaries of the policy. If it be claimed that the declaration of good health should be understood always to mean good health so far as the subject of insurance knows, and that no man may know what hidden disorder may be preparing to cut off his life, and therefore he cannot give more than a declaration according to his knowledge, the answer must be that such are not the terms, and that if it had been the intention of the parties to make the declaration with that qualification it would have been stated in fitting terms. It would have been just as easy to make the question read, "are you now in good health according to your honest opinion?" or for the party answering to have declared "yes, so far as I know." There can be no question, we think, but that a contract on the above terms would be a different one from that which was made, and equally there can be no question of law, that the parties are held to the contract they have made, and not to another which they might have made. The warranty of good health was asked for by the company and given by the applicant, and the contract made on that condition. In a few days the fact was disclosed that the applicant had at that time an organic, mortal disease. The warranty of good health was, therefore, broken.

As a verdict for the defendant is the only one that would be authorized upon the law and the undisputed facts of this case, we think the proper course now is to order judgment for the defendant *non obstante veredicto*, and it is so ordered.

Castle & Hatch for plaintiff.
A. S. Hartwell and B. H. Austin for defendant.
Honolulu, June 6, 1881.

---

DISSENTING OPINION OF CHIEF JUSTICE HARRIS.

This case was tried at the July Term, 1880, and a verdict

given for the plaintiff. A motion was made to set aside the verdict, and the opinion of the Court was filed September 25th, granting the motion and ordering a new trial. From this opinion I had the misfortune to dissent. Having since well reviewed my reasons given at that time, I see no reason for changing my opinion; and inasmuch as I then thought that the verdict should not be set aside, and a new trial granted, it follows that I must now respectfully dissent from the conclusion which the majority of the Court have reached.

Honolulu, June 6, 1881.